**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CASSANDRA ALGER, | ) | CASE NO. 1:25-CV-1879 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION** |
| SECURITY, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

## I.      INTRODUCTION

The Commissioner of Social Security denied Plaintiff Cassandra Alger's application for a

period of disability, Disability Insurance Benefits (DIB), and Supplemental Security Income (SSI).

Ms. Alger seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

(Compl., ECF No. 1.) The parties have consented to a magistrate judge exercising jurisdiction over

the case pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure, and Local

Rule 73.1. (Consents and Order, ECF No. 5.)

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision denying

Ms. Alger's application for benefits.

## II.      PROCEDURAL HISTORY

In April 2017, Ms. Alger applied to the Social Security Administration (SSA) seeking a

period of disability and DIB.[1] (Tr. 1266.) She first claimed that she became disabled on September

18, 2014, but the date was later amended to June 1, 2017. (*Id.*; Tr. 2050.) She identified five

---

[1] The administrative transcript appears at ECF No. 7. The Court will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 2031"). It will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 9-1") and page-identification numbers (e.g., "PageID# 6031").

allegedly disabling conditions: (1) osteoarthritis of the bilateral knees; (2) osteoarthritis of the bilateral thumbs; (3) osteoarthritis of the right ankle; (4) herniated cervical discs at the C2–C3 and C3–C4 levels; and (5) "shingles/neuralgia pain." (Tr. 1303.)

The SSA denied Ms. Alger's application at the administrative level, after which she filed an administrative appeal in this court. (Initial Denial, Tr. 1140–42; Recon. Denial, Tr. 1148–50; 56; Hr'g Transcript, Tr. 1977–99; ALJ Decision, Tr. 1111–26.) Ms. Alger appealed to the SSA Appeals Council, and it remanded the decision to the ALJ. (Tr. 1131–33.) The Council remanded the matter for the ALJ to further evaluate Ms. Alger's work history and explain conclusions regarding her past relevant work. (*See id.*)

The ALJ held a second hearing and, ultimately, issued a second decision finding that Ms. Alger is not disabled. (Hr'g Transcript, Tr. 1061–80; ALJ Decision, Tr. 1040–54.) The decision was ultimately appealed to this court, which, by stipulation of the parties, reversed the decision and remanded the case back to the agency for further proceedings. (Tr. 2825.)

In June 2022, Ms. Alger filed a claim for SSI; the claims were consolidated when the Appeals Council remanded the matter back to the ALJ pursuant to this court's order. (Tr. 2863.) The Appeals Council directed the ALJ the further evaluate Ms. Alger's mental impairments and give further consideration to her maximum residual functional capacity in light of additional evidence received at the appeals level. (Tr. 2862–63.)

A different ALJ held a hearing (the third hearing in this matter) on November 28, 2023. (Tr. 2045–69.) The ALJ thereafter issued a decision on June 25, 2024, finding that Ms. Alger is not disabled. (Tr. 2007–32.) On July 17, 2025, the ALJ issued a written declination of exceptions to the final decision, rendering the ALJ's decision final. (Tr. 2000–03.)

On September 9, 2025, Ms. Alger filed her Complaint, challenging the Commissioner's final decision that she is not disabled. (ECF No. 1.) Ms. Alger asserts the following assignments of error for review:

> **First Assignment of Error:** The RFC is not supported by substantial evidence because it is inconsistent with the objective medical record.
>
> **Second Assignment of Error:** The ALJ's evaluation of Plaintiff's sleep disorders does not properly evaluate the entire body of evidence and fails to draw a logical bridge between the evidence and his conclusions.
>
> **Third Assignment of Error:** The ALJ failed to evaluate whether Ms. Alger could sustain competitive employment on a regular and continuing basis as required by SSR 96-8p.

(Pl.'s Merit Br. at 21, 24, 27, ECF No. 9-1, PageID# 6031, 6034, 6037.)

Ms. Alger asserts, in her merits brief, that at some point a subsequent application for disability benefits was approved, holding that she has been disabled since June 25, 2024. (*See id.* at 24 n.2, PageID# 6034.)[2] The Agency does not dispute this. (*See* Def's Br. at 2 n.2, ECF No. 11, PageID# 6044.)

## III.  BACKGROUND

### A.  <u>Personal, Educational, and Vocational Experience</u>

Ms. Alger was born in November 1969 and was 47 years old on the date of her application. (*E.g.*, Tr. 1266.) She graduated from high school and took some college courses. (Tr. 2051.) She lives alone in a one-story house. (Tr. 1980.) Her adult son comes over occasionally to help care for

---

[2] Ms. Alger argues, in a footnote, that this fact conflicts with the ALJ's decision here, presumably because for one day (June 25, 2024) the Agency has found her to be both disabled and not disabled. (Pl's Br. at 24 n.2, ECF No. 9-1, PageID# 6034.) She contends that the conflict "raises issues regarding Ms. Alger's disabled status earlier." (*Id.*) The Court notes the inconsistency, but Ms. Alger fails to identify what other "issues" it raises or substantively argue that the inconsistency has any legal effect. In the absence of meaningful argument on the issue, the Court need not dwell on this matter, which was raised in a perfunctory manner in a footnote. *E.g.*, *McPherson v. Kelsey*, 125 F.3d 989, 995–96 ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.") (quotation marks omitted) (internal alteration omitted).

her, and her mother also helps care for her. (Tr. 2051.) She testified that she is physically unable to drive. (Tr. 2053.) She has previous work as a lifeguard, cashier, grocery clerk, and in customer service. (Tr. 1066, 1981–82.) She last worked in March 2020. (Tr. 2052.)

### B.  Function Report

Ms. Alger completed a function report on July 29, 2020. (Tr. 1393–98.) She wrote that she was unable to carry any amount of weight and could lift up to 10 pounds occasionally, due to the abdominal drains installed to treat complications from her perforated bowel. (Tr. 1393.) She identified that she could sit, stand, and walk for zero minutes in an eight-hour workday due to continuous pain and narcotic use. (Tr. 1394.) She wrote that she uses a cane to ambulate and, without it, can only ambulate around her house or in a "small store." (*Id.*) She identified that she can frequently reach, handle, finger, feel, and push or pull with her left hand. (Tr. 1395.) She can frequently push or pull with the right hand, but only occasionally reach or feel and never handle or finger. (*Id.*) She can occasionally operate foot controls with her feet. (*Id.*)

Ms. Alger identified that she can occasionally climb ramps and stairs, balance, and stoop. (Tr. 1396.) She can never kneel, crouch, or crawl. (*Id.*)

### C.  Relevant Hearing Testimony

#### 1.  *Ms. Alger's Testimony*

Ms. Alger testified at the first hearing that she was working part time as a lifeguard, but that she was physically unable to do some of her tasks in that role. (Tr. 1981.) She does not guard children and there is always another lifeguard on duty in the building when she is working, because she would not be able to pull someone out of the pool. (Tr. 1983.) She has never had attendance issues at work. (Tr. 1986–87.)

Ms. Alger described that she has "very limited" use of her right hand, has severe arthritis in her knees, has herniated discs in her cervical spine, has had surgery on her right ankle, has

restless leg syndrome, and has sleep disorders. (Tr. 1985.) She managed these conditions for 14 years with the help of a service animal, but the dog passed away and she is waiting for her next dog to complete training. (Tr. 1986.)

Ms. Alger described that she has walked in her sleep since she was a child; she uses special door locks at night. (Tr. 1985–86.) Three or four mornings a week, she will wake up and not be sure if she is awake or dreaming. (Tr. 1986.) She has frequently gone to the emergency room after sleepwalking, as she falls often, including falling down the stairs. (Tr. 1989–90.)

Ms. Alger's ankle still bothers her after her 2009 surgery. (Tr. 1987.) She feels a "dull, achy pain" and her ankle will swell when she is standing. (*Id.*) She can stand for no more than 10 or 15 minutes at a time, after which time she needs to sit or lay down for about 15 minutes. (Tr. 1987–88.) If she stands for too long, she will also get sciatica pains in her back down her right leg. (Tr. 1988.) She can walk for about 15 minutes before needing to sit down. (Tr. 1989.) She estimated that she would need three to four extra 15-minute breaks in a full workday in order to sit or lay down to alleviate pain. (*Id.*) Ms. Alger has been recommended to undergo bilateral knee replacements, as injections have been ineffective at managing her pain. (Tr. 1990.)

Ms. Alger has broken her thumb, her wrist, and her radial bone from falling. (*Id.*) She is not able to grab things, write, or unscrew a bottle of water. (Tr. 1991.) She is able to do some limited typing and handle her phone with her left hand. (*Id.*) She has adaptive tools in the home, including adaptive door handles and cooking utensils. (*Id.*) She is able to wash dishes if she holds the dish in her left hand. (*Id.*) She does not believe she could fold clothes all day, due to pain from moving her hand. (*Id.*) She has numbness and a tingling nerve pain in three of her fingers, from shingles. (Tr. 1994.)

Ms. Alger has sleep apnea, but the condition has improved with use of a CPAP machine. (Tr. 1995.) Though when she sleepwalks, she will not put the mask back on and will wake feeling exhausted. (*Id.*)

Ms. Alger testified at the second hearing that she transitioned from a lifeguard to a part-time water fitness instructor, working four days a week for usually under 20 hours a week, until March 2020. (Tr. 1065.) She has not worked since March 2020. (*Id.*) Her health has deteriorated since the first hearing. (Tr. 1068.)

In May 2019, Ms. Alger underwent a total knee replacement of her left knee. (*Id.*) She found that the surgery helped with her instability. (Tr. 1072.) But in June 2019, during a routine colonoscopy, the doctor perforated her bowel. (*Id.*) She has been hospitalized six times and undergone four surgeries as a result of the mistake. (*Id.*) She is feeling better in some ways after these procedures, although she is unable to eat very much or do very much. (Tr. 1070.) She has lost 30 pounds since the colonoscopy. (*Id.*) She is on a limited diet and finds herself having to go "back and forth" to the restroom for a couple hours after she eats. (Tr. 1070–71.) She has not been able to exercise or walk very much. (Tr. 1072.) She has had to stop using her CPAP machine until her bowel heals. (Tr. 1073.) Her restless legs have gotten worse due to lack of exercise. (*Id.*) She has been receiving psychiatric and mental health treatment for severe depression. (Tr. 1074–75.)

At the third hearing, Ms. Alger testified that she is now unable to drive, cannot stand or sit in one position for long, has constant pain in her back and her knee, and has vertigo, which causes her some days to vomit continuously throughout the day. (Tr. 2053.) She receives back injections and is currently discussing getting another knee replacement. (*Id.*) She uses ice throughout the day and takes pregabalin and acetaminophen with codeine. (*Id.*) The medications help somewhat, but not completely, and they make her very drowsy. (*Id.*)

6

Ms. Alger has experienced vertigo almost daily since her colonoscopy. (*Id.*) She has undergone vestibular therapy and takes nausea medicines. (Tr. 2054.) Her doctor told her not to drive because she is on narcotic medication and grows very dizzy when she turns her head. (*Id.*)

Ms. Alger estimated that she can stand for between five and ten minutes before feeling pain. (*Id.*) She is able to sit for between two and five minutes before needing to change positions. (*Id.*) She can walk for between 10 and 15 minutes at a time. (Tr. 2055.) She has used a cane and a walker since her 2019 knee replacement. (*Id.*) Her right knee is unstable, and she estimated that she has fallen close to 100 times in three years. (*Id.*)

Ms. Alger has depression and anxiety, for which she takes medication. (*Id.*) She had seizures after her colon perforation, after which she has trouble with words and reading. (Tr. 2056.)

Ms. Alger's son mows the lawn and does all the outside work for her. (Tr. 2058.) He will make food and put it in the refrigerator, so that Ms. Alger just has to warm it up. (*Id.*) He and Ms. Alger's mother do all the grocery shopping, although Ms. Alger will accompany them once a month. (*Id.*) Her mother does the cleaning and laundry. (*Id.*)

Ms. Alger's cervical disc compression causes her arms and fingers to go numb daily. (Tr. 2060.) She finds herself dropping things. (*Id.*)

Ms. Alger still sleepwalks, around twice a week. (*Id.*)

Ms. Alger underwent ankle ligament reconstruction. (*Id.*) The procedure helped, but Ms. Alger still experiences arthritis pains. (Tr. 2061.)

### 2. *Vocational Expert's Testimony*

Laura Pizzurro testified as a vocational expert ("VE") at the third hearing. (Tr. 2061.)

The ALJ asked the VE to assume that a hypothetical individual with Ms. Alger's age, education, and work experience is capable of work at the light exertional level, with additional limitations. (Tr. 2062.) Specifically, the person can occasionally push or pull with the bilateral

7

upper extremities. (*Id.*) They can occasionally climb ramps and stairs but cannot climb ladders, ropes, or scaffolds. (*Id.*) They can frequently stoop and occasionally kneel, crouch, and crawl. (*Id.*) They can frequently handle, finger, and feel bilaterally. (*Id.*) They must avoid concentrated exposure to humidity and fumes, odors, dust, gases, and poor ventilation. (*Id.*) They must avoid all exposure to hazards like unprotected heights, moving machinery, and commercial driving. (*Id.*) They can tolerate a routine work setting and can respond appropriately to supervisors and co-workers in work situations if the tasks performed are goal oriented and performed without a production rate pace. (*Id.*) The work must not require more than superficial interaction, meaning that it does not require negotiating with, instructing, persuading, or directing the work of others, and the work cannot require tandem work. (Tr. 2062–63.) The work cannot involve interaction with the public. (Tr. 2063.)

The VE testified that such a person could not perform Ms. Alger's past relevant work as a cashier checker (DOT 211.462-014) but could perform the work of a marker (DOT 209.587-034), order caller (DOT 209.667-014), or mail clerk (DOT 209.687-026). (*Id.*)

The ALJ next asked the VE to limit the individual to only occasionally bilateral handling, fingering, and feeling. (Tr. 2064.) The VE testified that no work would be available to someone so limited. (*Id.*)

The ALJ next asked the VE to return to the first hypothetical question, but limit the person to work at the sedentary level. (*Id.*) The VE testified that the only work available to such a person would be a document preparer (DOT 249.5887-018), with 6,000 positions available in the national economy. (*Id.*)

The VE confirmed that no work would be available to an employee who is off task more 20 percent of time, or who is absent two times per month on an ongoing basis. (Tr. 2065.)

Ms. Alger's counsel asked the VE to assume that the individual from the first hypothetical would require a sit/stand option every 20 to 30 minutes lasting five to ten minutes before they could return to the prior position. (Tr. 2065–66.) The VE testified that no work would be available for such a person at either the light or the sedentary exertion levels. (Tr. 2066.)

### D. State Agency Consultants

A disability examiner (Jacqueline Ward), a physician (Maria Congbalay, M.D.), and a psychologist (Bruce Goldsmith, Ph.D.) reviewed Ms. Alger's claim at the initial review level. (Tr. 1081–92.)

Dr. Congbalay opined that Ms. Alger's statements about her pain were fully consistent with the record. (Tr. 1087.) Dr. Congbalay limited Ms. Alger to occasionally lifting up to 20 pounds and frequently up to 10 pounds. (*Id.*) Ms. Alger can occasionally push or pull with the bilateral lower extremities. (Tr. 1088.) She can occasionally climb ramps and stairs, kneel, crouch, and crawl. (*Id.*) She can frequently stoop and has no balance limitations. (*Id.*) She is not limited in her ability to reach, but she is limited to frequent handling and fingering bilaterally. (*Id.*) Dr. Congbalay noted that the record showed that injections were helpful in the left hand, and that Ms. Alger had successfully undergone arthroplasty in the right and was "doing well post op." (*Id.*)

Dr. Goldsmith found only mild mental health limitations and opined on no functional limitations stemming from them. (Tr. 1086.)

Based on this opinion, the consultants determined that Ms. Alger could perform the work of an information clerk (DOT 237.367-018), office helper (DOT 239.567-010), or sales attendant (DOT 299.677-010). (Tr. 1090.) The consultants therefore found that Ms. Alger was not disabled. (*Id.*)

In a letter explaining the decision to Ms. Alger, the agency wrote that it found that she had a limited ability to lift and carry objects due to pain, discomfort, and a loss of mobility, but she had

9

good enough strength and movement to sit, walk, and do some lifting to complete some types of light work. (Tr. 1140.)

A disability examiner (Zachary Smith), a physician (Obiaghanwa Ugbana, M.D.), and a psychologist (Melanie Bergsten, Ph.D.) reviewed Ms. Alger's claim at the reconsideration level. (Tr. 1093–1107.)

Dr. Bergsten agreed that Ms. Alger's mental health impairments were not severe. (Tr. 1100.)

Dr. Ugbana added certain environmental limitations but otherwise found that the evidence did not suggest a significant change in Ms. Alger's functional capacity since the initial level decision. (Tr. 1103.)

Based on this opinion, the consultants affirmed the initial findings and opined that Ms. Alger could perform the work of a surveillance-system monitor (DOT 379.367-010), laminating-machine offbearer, or cotton classer aide (DOT 429-587-010). (Tr. 1105.) The consultants affirmed that Ms. Alger was not disabled. (*Id.*)

In a letter to Ms. Alger, the agency wrote that while her impairments may interfere with her daily activities occasionally, "more often [she] remain[s] able to tend to [her] own personal needs" and make decisions on her own behalf, and she remains capable of light and sedentary work. (Tr. 1148.)

### E. Relevant Medical Evidence

#### 1. Musculoskeletal Impairments

Ms. Alger underwent a right carpal tunnel release procedure in 2005. (Tr. 1513.) She reported that she no longer experienced numbness or paresthesia in her right hand after the procedure, and she had full range of motion on examination. (*Id.*)

She returned three years later, complaining of paresthesia in the left hand. (*Id.*) Electromyography confirmed moderate left median neuropathy. (*Id.*) On examination, she had good range of motion in both wrists but showed significantly positive signs of carpal tunnel compression on the left side. (*Id.*) She thereafter underwent a left carpal tunnel release procedure, after which she said she was doing "great." (Tr. 1512.)

Ms. Alger consulted with James Walker, M.D., in June 2011 after feeling her knee "pop." (Tr. 3051.) On examination, she retained "reasonable motion" but was hesitant to flex the knee. (*Id.*) Dr. Walker assessed that she may have "shifted her kneecap" and placed her in a joint immobilizer. (*Id.*) A week later, she was doing better and was "good and stable." (*Id.*) Dr. Walker recommended physical therapy, but Ms. Alger declined in favor of home exercises. (*Id.*)

On August 30, 2011, Ms. Alger felt her knee catch and pop again. (*Id.*) On examination, there was significant medial joint line tenderness and anterior pain, but the kneecap seemed stable. (*Id.*) Dr. Walker ordered magnetic resonance imaging. (*Id.*) The imaging revealed no tear, effusion, or intra-articular bodies, but there was "severe thinning" of the articular cartilage within the mid aspect of the apex patella, with a focal area of fissuring within the lateral facet of the patella near the apex. (Tr. 3065.) There was also a three-millimeter nondisplaced chondral flap noted. (*Id.*)

Ms. Alger was diagnosed with patellofemoral arthritis, but she was noted to be doing well and the plan was for her to continue home exercises. (Tr. 3052.)

Ms. Alger saw Dr. Walker again on October 5, 2011, complaining of left elbow pain for two weeks. (*Id.*) Her symptoms were consistent with tennis elbow and were treated with an injection, a tennis elbow strap, and stretching exercises. (*Id.*)

She returned in December 2011, requesting injections in the elbow and knee. (*Id.*) She was given the injections and recommended to physical therapy to treat anterior knee pain and the tennis elbow; she was also referred for replacement orthotics to treat high arches and ankle pain. (*Id.*)

She returned in January 2012, reporting that the injection had not helped her knee pain. (Tr. 3053.) Dr. Walker then planned for vicosupplementation, and Ms. Alger received three hyaluronate injections in January. (*Id.*)

She received another elbow cortisone injection in February 2012. (Tr. 3053.)

She reported improvement in the elbow for a month and a half, but the pain returned in April 2012. (Tr. 3054.) As of that time, she was no longer complaining of left knee pain. (*See id.*) But she asked for vicosupplementation of her right knee, as the treatment had "worked well on the left." (*Id.*) She received three hyaluronate injections in the right knee through April and May 2012. (Tr. 3054–55.)

 She underwent a Topaz debridement procedure for the elbow in May 2012. (Tr. 3060.) She tolerated the procedure well, and it was noted in follow-up appointments that her ability to flex had gotten "a lot better"; she was continued on stretching exercises. (Tr. 3055.)

As of June 2012, the right knee was "doing fine." (*Id.*) There was good motion in the elbow, although there was still some pain over the procedure scar. (*Id.*)

In August 2012, Ms. Alger reported that her knees were "acting up." (*Id.*) Dr. Walker planned another round of hyaluronate injections, as the treatment had worked "really well" previously. (*Id.*) She received another round of injections, but she returned in November 2012 complaining that the injections had not helped, especially in the left knee. (Tr. 3055–56.) She was referred to physical therapy, but as of early January 2013 she continued to report knee pain. (Tr. 3056–57.)

In February 2013, Ms. Alger underwent a left knee arthroscopy procedure, including chondroplasty and minimal debridement. (Tr. 3056–57, 3061.) During the procedure, "some . . . chondrosis" was noted on the patella and "some fraying" was noted in the medial meniscus. (Tr. 3061.) Ms. Alger reported doing better after the procedure, and she was started on physical therapy. (Tr. 3057.) In April 2013, Dr. Walker noted that Ms. Alger was continuing to "do her hiking and such." (Tr. 3058.)

In July 2013, Ms. Alger reported that her knees were "both acting up" again. (Tr. 3059.) She was approved for additional vicosupplementation in August 2013, but it is not clear if she ultimately received those injections. (*See* Tr. 3059.)[3]

In September 2013, Ms. Alger reported a fall on the stairs leading to a twisted knee and a bruised hip. (*Id.*; *see also* 1736–44.) Dr. Walker noted that the knee "looks good" and was "getting better," such that no treatment was needed at that time unless the knee would not "settl[e] down." (Tr. 3059.)

Nearly a year later, Ms. Alger presented to the emergency department after a fall when stepping down from a single stair. (Tr. 1724.) She reported that her left knee "gave out," causing her to twist her left knee and ankle and fall to her leg. (*Id.*) X-ray imaging revealed no fractures, but osteoarthritis was noted in the left knee. (Tr. 1725; *see also* 1722.) She was diagnosed with a sprain of the left knee and ankle and discharged in a knee immobilizer brace. (Tr. 1725.)

MRI imaging on September 1, 2014 confirmed tricompartmental osteoarthritis in the left knee, most severe within the patellofemoral compartment. (Tr. 1564.)

---

[3] Ms. Alger cited a July 31, 2013 MRI report from a hip scan, but the MRI report is for a different of Mr. Walker's patients—J.S., with a date of birth in 1939. (*See* Tr. 3067.)

13

Based on these results, Ms. Alger underwent another arthroscopic procedure on the left knee on September 18, 2014, which involved a lateral release and chondroplasty. (Tr. 1559.) She had postoperative pain and swelling two days after the procedure, after beginning her postoperative home exercises, but a physician suspected this may be an inflammatory response to residual iodine on the skin after the surgery. (Tr. 1715–16.)

Ms. Alger presented to the emergency department over a year and a half later, on April 3, 2016, complaining of right wrist and right thumb pain after a fall four days ago. (Tr. 1454.) On examination, she was tender to palpation on the distal radius and thumb, and there was pain when assessing passive range of motion. (Tr. 1456.) X-ray imaging was negative for bone injuries, and Ms. Alger was given a wrist splint for a sprained wrist and discharged. (Tr. 1457.)

When Ms. Alger followed up with Dr. Walker on April 8, 2016, she reported moderate pain and some stiffness and swelling, primarily over the base of the thumb. (Tr. 1582.) Dr. Walker diagnosed a thumb sprain which would "heal on its own in time." (*Id.*) Dr. Walker noted that x-ray imaging of the right hand revealed moderate thumb arthritis. (*Id.*)

In June 2016, magnetic resonance imaging of the cervical spine showed probable impingement at the C7 nerve root, moderate left neural foraminal stenosis, and mild left ventral thecal impingement. (Tr. 1546.)

When Ms. Alger followed up with Dr. Walker regarding her knee osteoarthritis on June 20, 2016, Dr. Walker noted that she was doing "fairly well" and that "cortisone injections [had] provided long lasting relief." (Tr. 1580.) There was no swelling or effusion or changes in her range of motion. (*Id.*) She was fully weight bearing without the use of aids, although she described her pain as moderate. (*Id.*) She was given cortisone injections and told to keep her knees moving and follow up for additional injections every three months as needed. (*Id.*)

14

At an appointment with Dr. Walker on September 26, 2026, Ms. Alger reported falling a couple weeks before the appointment when her "right knee gave out." (Tr. 1578.) She described her pain as moderate, but on examination there was no swelling and her range of motion was unchanged. (*Id.*) She was trialed on a steroid dose pack to see if that improved the pain. (*Id.*)

In December 2016, Ms. Alger sought treatment with Dr. Nahra for injuries sustained in October 2016 when she slipped and fell on a wet floor at work. (Tr. 1510.) On examination, she had good range of motion of the left hand, wrist, and elbow, except she had moderate stiffness and reduced range of motion of the left thumb. (*Id.*) There was palpable crepitation in the left thumb, and there was a positive grind test. (Tr. 1509.) She had full muscle strength in the hand and wrist. (*Id.*) Dr. Nahra believed that she suffered a left wrist sprain that aggravated her underlying basal thumb joint arthritis. (*Id.*) She was advised to use an over-the-counter arthritis cream and wear a supportive splint at night, and she was cleared to return to regular work activity. (*Id.*)

Ms. Alger reported continued pain and swelling in her wrist at an appointment with Dr. Walker on January 23, 2017. (Tr. 4018.) She was assessed to have De Quervain's tenosynovitis. (*Id.*) With respect to her knees, Ms. Alger reported that the steroid medication had relieved her pain for two weeks. (*Id.*) Dr. Walker recommended formal physical therapy for the knees and for the elbow. (*Id.*)

When Ms. Alger returned on June 5, 2017, she reported that she completed three to four weeks of physical therapy before she needed to stop due to shingles. (Tr. 1584.) She said that she had fallen onto her knees a few weeks before the appointment, which had increased her pain. (*Id.*) She complained of sharp pain across the knees when she sits and described that her activities of daily living were limited. (*Id.*) On examination, there was no swelling or crepitus in the knees and unchanged range of motion. (*Id.*) There was medial joint line tenderness in the right knee with a

15

positive McMurray test. (*Id.*) MRI imaging of the right knee revealed mild edema, mild patellofemoral osteoarthritis, and residual signs of a chronic low-grade sprain of the proximal PCL ligament. (Tr. 1542, 1572.) She was told that she would "always have aches and pains," and she was encouraged to continue persistently doing her exercises and stretches. (Tr. 1572.)

On October 30, 2017, Ms. Alger complained of significant pain and said her left knee "locks up." (Tr. 1587.) A physical examination revealed no swelling or effusion or decreased range of motion, but there was crepitus noted. (*Id.*) Dr. Walker advised that there was "significant wear behind the kneecap which causes pseudo locking." (*Id.*) He ordered a custom brace and recommended physical therapy; Ms. Alger said that she will exercise on her own at home. (*Id.*) Dr. Walker noted assessments of patellofemoral chondrosis and primary osteoarthritis of the left knee. (*Id.*)

Ms. Alger responded favorably to a cortisone injection in the wrist in November 2017, but she returned to Dr. Nahra in January 2018 when the pain returned. (Tr. 1802.) On examination, she had localized tenderness in the right wrist, with swelling noted. (*Id.*) She decided to proceed with surgery, and she underwent a right wrist tendon release and repair procedure in February 2018. (*Id.*) After the procedure, she reported that she was comfortable. (*Id.*)

Ms. Alger returned to Dr. Walker in June 2018, requesting cortisone injections for the knees. (Tr. 1794.) On examination, there was decreased range of motion and crepitus in the bilateral knees. (*Id.*) She received the injections and was encouraged to continue exercising in the pool. (*Id.*)

MRI imaging of the left knee in February 2019 revealed tricompartmental osteoarthritis with moderate medial femorotibial osteoarthritis with grade III chondromalacia in the

16

weightbearing portion of the compartment, moderate patellofemoral osteoarthritis, a small knee joint effusion, and degenerative meniscal changes. (Tr. 1934–35.)

At an appointment in March 2019, Ms. Alger said she had "occasional" pain in her right wrist and hand. (Tr. 3741.) On examination in May 2019, Ms. Alger had "slight grip weakness" in the right hand; the doctor noted that orthopedics wanted to "go back in and repair the tendon/plate/screw." (Tr. 3738.)

Ms. Alger underwent a total left knee arthroplasty in June 2019 and a manipulation under anesthesia of the same joint in July and August 2019. (Tr. 1940, 4097.)[4] By December 2019, her pain was improved ("None") and she was fully weight bearing without aids. (*Id.*) She reported some stiffness and was continued on a regimen of physical therapy and stretching exercises. (*Id.*) She was released to work full-duty as a lifeguard. (Tr. 4098.)

Ms. Alger consulted with Dr. Walker on January 6, 2020, complaining of pain in the left hip. (Tr. 1966.) She was diagnosed with trochanteric bursitis and treated with a cortisone injection. (*Id.*)

At a follow up appointment in May 2020, Ms. Alger reported that the hip injection provided good relief until a month ago and her right knee had felt good until February 2020. (Tr. 1970.) On examination, there was no hip swelling or crepitus, and there was good range of motion in the right knee. (*Id.*) She received cortisone injections in the left hip and right knee. (Tr. 1970–71.)

In July 2021, Ms. Alger treated with Emad Mikhail, M.D., for back and neck pain. (Tr. 346.) On examination, there was tenderness over the bilateral cervical paraspinal muscles,

---

[4] The Court acknowledges that Ms. Alger's early recovery was complicated by an infection or inflammatory reaction (*see* Tr. 1943), a reported fall (Tr. 1948), and a stitch abscess (Tr. 1951) prior to the August 2019 manipulation procedure. In September 2019, she reported healing fairly well and was ambulating with a cane, although she had reduced range of motion. (Tr. 1956.) By October 2019, with continued therapy exercises, her pain was "minimal" and her range of motion was improving slowly. (Tr. 1962.)

restricted range of motion, and moderate muscle stiffness. (Tr. 351.) Ms. Alger was ambulating with a cane and had an antalgic gait. (Tr. 352.) There was a flat lumbar curvature with tenderness and facet loading. (*Id.*) Ms. Alger was assessed with cervicalgia and chronic low back pain with sciatica. (*Id.*) She was counseled to increase her activity level, and imaging was ordered. (Tr. 352–53.)

Imaging of the lumbar spine revealed facet arthropathy bilaterally at the L4–L5 and L5–S1 levels and mild stenosis of the left L5–S1 neural foramen. (Tr. 222.) Imaging of the cervical spine revealed mild disc space narrowing at the C5 – 6 and C6 – 7 levels, consistent with cervical spondylosis. (Tr. 224.)

When Ms. Alger met with Dr. Mikhail on August 2, 2021, she was continued on her current treatment plan and scheduled for branch block procedures. (Tr. 360.) She underwent the procedures on August 18 and August 25, 2021. (Tr. 363, 369.)

Ms. Alger reported that the procedure provided 80 percent improvement, but she said the improvement did not last. (Tr. 375.) She was therefore recommended for radiofrequency ablation in September 2021. (Tr. 381.)

When Ms. Alger met with Dr. Walker in December 2021, she reported that she had fallen three weeks ago but was "doing well." (Tr. 5486.) She complained of trochanteric bursitis pain and received an injection, as "these have worked previously for her." (Tr. 5486–88.)

Ms. Alger consulted with Dr. Mikhail on January 21, 2022. (Tr. 4530.) She described her back and neck pain as a five out of ten, and her left knee pain as a seven out of ten. (Tr. 4530–31.) There was mild or moderate tenderness, stiffness, and muscle spasm noted around the spine. (Tr. 4535–36.) There was mild or moderate tenderness, stiffness, swelling, and effusion noted in the

18

knees. (*Id.*) She was scheduled for a left genicular nerve block. (Tr. 4537.) Two such procedures occurred in February and March 2022. (Tr. 4515, 4527.)

Ms. Alger complained of continued left knee pain on April 22, 2022, but she reported that the left genicular nerve block had provided 50 percent relief for four weeks. (Tr. 4507.) She was recommended for radiofrequency ablation of the left genicular nerve. (Tr. 4512.) That procedure occurred on April 25, 2022. (Tr. 4500.)

Ms. Alger consulted with Dr. Mikhail on May 27, 2022. (Tr. 4491.) Her left knee pain was a two out of ten. (*Id.*) She endorsed improvement in the level and frequency of her pain. (*Id.*) She reported that her spinal procedures had been and remained 80 percent effective at providing relief. (*Id.*) On examination, she had a mildly antalgic gait and there was mild or moderate tenderness and muscle spasm noted around the spine. (Tr. 4496.) She was continued on her treatment plan. (Tr. 4497.)

In June 2022, Dr. Walker noted that Ms. Alger's hip injections were working for about six months at a time. (Tr. 5482.) She received another injection in each hip. (*Id.*)

In July 2022, Ms. Alger followed up with Dr. Nahra complaining of significant pain over the base of the left thumb. (Tr. 5216.) On examination, she had bone and soft tissue swelling at the basal thumb joint with crepitation upon circumduction. (*Id.*) X-ray imaging revealed diffuse osteoarthritic changes and moderately severe degenerative arthritis at the basal thumb joint. (*Id.*) She was given a corticosteroid injection at the CMC joint. (*Id.*)

Ms. Alger received her bilateral hip injections on December 1, 2022, with Dr. Walker noting that they were still helping for six months at a time. (Tr. 5829.)

At an appointment with Dr. Mikhail on December 16, 2022, Ms. Alger reported that her left knee felt stable but caused her worsening pain at a level of six out of ten. (Tr. 5502.) She was

again recommended for radiofrequency ablation of the left genicular nerve. (Tr. 5507.) The procedure occurred on December 19, 2022. (Tr. 5513.)

In December 2022, Ms. Alger presented to the emergency department complaining of pain from her left hip radiating down behind her right knee. (Tr. 5750.) She was concerned that she had a blood clot. (*Id.*) On examination, there was normal spine range of motion and there was no muscle or joint tenderness except in the distal knee flexors, consistent with distal hamstring pain. (Tr. 5748.) She was cleared of concerns regarding a blood clot and discharged. (Tr. 5750.)

At an appointment with Dr. Mikhail on January 16, 2023, Ms. Alger reported that her left knee pain was improving, and that the ablation had provided 50 percent relief. (Tr. 5523.) She underwent physical therapy in January, February, March, and April 2023. (Tr. 5584, 5582, 5580.) While she struggled with pain and strength, by April she was showing moderate improvement in walking in the community, recreational activities, heavy exertion, lifting, pain, range of motion, and physical activities (Tr. 5562; *see also* 5565, 5576), although the progress was up and down. (Tr. 5568, 5560, 5558.)

In April 2023, Ms. Alger saw Julia A. Heng, M.D., for pain management. (Tr. 5676.) She reported two or more falls with injury in the past year but reported no difficulties walking, with balance, or with performing activities of daily living. (*Id.*) She rated her pain at a severity of three out of ten. (Tr. 1677.) On examination, she was slightly tender behind the right knee and her neurological functioning was normal. (Tr. 5677–78.) She was prescribed a TENS unit for use on the left knee, which had been requested by Ms. Alger's physical therapist to improve range of motion. (Tr. 5678.)

In May 2023, Ms. Alger followed up after her right ankle surgery. (Tr. 5554.) She reported that she has "no significant pain" and was "doing great." (*Id.*) She is sometimes achy, but she is

20

"fully functional with minimal to no pain and able to complete all activities of daily living without any issues." (*Id.*) Her physical examination was materially normal, and x-ray imaging revealed a well-healed fracture. (Tr. 5556.)

Ms. Alger consulted with Emad Mikhail, M.D., on May 26, 2023, complaining of mild left knee pain. (Tr. 5549.) On examination, she had mild to moderate tenderness and swelling of the left knee with mildly limited range of motion. (Tr. 5552.) She was recommended to physical therapy and to continue with a home exercise program and her current medications, and she was counseled to increase her activity. (*Id.*)

Ms. Alger reported pain at a three out of ten at an appointment in June 2023, and she was continued on her medication. (Tr. 5669–74.) She reported that her restless legs were "doing well" at an appointment with her neurologist the same month. (Tr. 5645.)

Ms. Alger underwent another left knee ablation procedure on June 28, 2023. (Tr. 5723.)

Ms. Alger received her bilateral hip injections on July 13, 2023, with Dr. Walker again noting that they were still helping for six months at a time. (Tr. 5837.)

Ms. Alger complained of vertigo and migraine headaches at an appointment on July 20, 2023. (Tr. 5911.) A neurological examination was normal, and she had normal strength in all extremities. (*Id.*) Medication changes were made, and she was started on vestibular rehabilitation to treat benign paroxysmal positional vertigo. (Tr. 5912.)

X-ray imaging of the hips and pelvis from July 2013 revealed mild bilateral hip osteoarthritis and lower lumbar facet arthropathy. (Tr. 5847.)

Ms. Alger consulted with Matthew Deren, M.D., on October 18, 2023, complaining of pain in the left knee at a severity of three out of ten. (Tr. 5925.) She described that she had undergone a number of procedures since her 2018 knee replacement and said that her pain and swelling was

21

worsening. (*Id.*) After examination and imaging, Dr. Deren ordered tests to rule out infection and was suspicious of hardware loosening. (Tr. 5928–29.)

### 2. Sleep Disorders

Ms. Alger consulted with Mitchell E. Nahra, M.D., in February 2017, reporting that she sleepwalks in the middle of the night and moves furniture around. (Tr. 1509.) She complained of pain over the base of the right thumb, which had been present for a year after what Ms. Alger believed may have been a fall while sleepwalking. (*Id.*) She noticed some bruising in her knee two weeks prior to the appointment, which she also believed may have been due to a fall while sleepwalking. (*Id.*)

In October 2017, Ms. Alger presented to the emergency department complaining of right arm and wrist pain subsequent to what she presumed was a fall while sleepwalking. (Tr. 1604.) She said she had awoken in the basement with a dull headache, some posterior neck soreness, and some pain in her right arm. (*Id.*) On examination, there was some diffuse soreness noted in the neck, lower back, and right arm, but there was normal range of motion. (Tr. 1606.) Diagnostic imaging was negative for acute traumatic findings. (Tr. 1610.) Ms. Alger asked for a wrist splint, and one was provided to her. (*Id.*) She was diagnosed with a right wrist sprain, contusion to the arm, cervical strain, and a headache and was discharged. (*Id.*)

On November 15, 2017, Ms. Alger saw Dr. Nahra, complaining of continued discomfort in her right thumb and wrist. (Tr. 1757.) She also reported that she had fallen while sleepwalking, most recently in October. (*Id.*) On examination, Ms. Alger's muscle strength was noted to be full, but she was significantly tender to palpation over the radial aspect of the right wrist. (*Id.*) She was given a corticosteroid injection. (*Id.*)

In August 2018, Ms. Alger followed up with John Baron, M.D., for a history of severe obstructive sleep apnea, restless leg syndrome, and sleepwalking. (Tr. 1768.) She reported sleepwalking or sleep talks at least twice a week, and she often awakens with her CPAP off. (*Id.*) While she felt rested after using the CPAP all night, she continued to complain of excessive daytime sleepiness. (*Id.*) Her restless legs were "fairly controlled." (*Id.*) Dr. Baron noted that Ms. Alger's sleepwalking may be partly due to obstructive sleep apnea. (Tr. 1771.) He increased the CPAP pressure and instructed Ms. Alger to use the CPAP machine every night. (*Id.*) He encouraged weight loss and exercise. (*Id.*) He noted that Ms. Alger was training a dog to detect when she is sleepwalking and lead her back to bed. (*Id.*)

In October and November of 2018, Ms. Alger sought treatment with neurologist Kristen A. Smith, M.D., for memory loss, sleepwalking, difficulty with word finding, and feeling like she is in a fog. Tr. 1788, 1791. She said her neighbors were worried because they have caught her outside. Tr. 1791. She reported that she had destroyed her couch, during a dream in which she had been weeding the garden. (*Id.*) She said her son had found her eating dog food "like it was popcorn" and she had once awoken to find her bed inexplicably filled with sand. (Tr. 1788.) Physical examinations were normal. (Tr. 1791–92.) Dr. Smith intended to review a sleep study and made medication changes, noting that the "multiple sleep related disorders" was "proving difficult to control." (Tr. 1788.) She recommended that Ms. Alger use a weighted blanket and indicated that she may consider adding mirtazapine or Sinemet (carbidopa/levodopa). (*Id.*)

On June 18, 2019, Ms. Alger followed up with a provider regarding a right ankle fracture. (Tr. 1946.) She reported that she had been sleepwalking more frequently without a medical boot or walker, such that when she wakes up her ankle is severely swollen. (*See id.*) She was prescribed

23

a stirrup ankle brace to use at bedtime "to protect and immobilize for sleep walking." (*Id.*) She returned two weeks later, reporting that she had fallen while sleepwalking. (Tr. 1948.)

### 3.    Gastrointestinal Impairments

Ms. Alger underwent a colonoscopy in June 2020, and a week later she was found to have a likely colon perforation and abdominal abscesses requiring drainage. (Tr. 1810, 1847, 1852.) She returned to the doctor with abdominal pain in July 2020, at which time surgery was recommended. (Tr. 1814–15.) She continued to have some abdominal pain in August 2020, and her blood pressure was high enough that she was recommended to the emergency department for evaluation. (Tr. 1818–19.) An echocardiogram showed a mildly dilated left atrium and mild mitral and tricuspid valve regurgitation. (Tr. 3752–53.)

Ms. Alger underwent a colon resection surgery in August 2020 that resulted in a diverting loop ileostomy. (Tr. 1836.) Pathology of the colon section revealed a small polyp with granulomatous inflammation, as well as chronic inflammation and fat necrosis of the pericolic adipose tissue. (Tr. 3132.)

On September 5, 2020, Ms. Alger presented to the emergency department with severe dehydration, hypotension, and hyponatremia caused by a high ileostomy output and her hypertensive medications. (Tr. 628–29.) She was admitted and treated with intravenous fluids and a medication adjustment, after which she was discharged. (*Id.*)

When Ms. Alger followed up with her surgeon at the end of September 2020, she reported feeling well. (Tr. 1823.)

On December 2, 2020, she presented to the emergency department with irritation surrounding the ostomy site and was admitted for concern of cellulitis (Tr. 544, 546). She was treated with intravenous antibiotics and discharged the following day with a diagnosis of contact

dermatitis (Tr. 562). On December 4, 2020, she contacted her primary care provider after her ostomy appliance detached, requiring in-office reapplication due to pain and skin breakdown (Tr. 148)

On December 17, 2020, Ms. Alger again presented to the emergency department following surgical consultation. (Tr. 424.) CT imaging revealed a fatty liver and some parastomal herniation of small bowel, and she was found to have mild leukocytosis (Tr. 428). On the same day, she was recommended for closure of the ileostomy. (Tr. 1891.)

On December 23, 2020, Ms. Alger underwent closure of the loop ileostomy, which involved a small bowel resection. (Tr. 1865, 1872–73.)

On July 22, 2021, Ms. Alger presented to the emergency department complaining of hypotension. (Tr. 4200–01) She denied abdominal pain, diarrhea, and vomiting. (Tr. 4201.) Her physical examination was largely normal (Tr. 4020), her blood pressure was improved after the application of intravenous fluids, and she was admitted for observation and continued improvement. (Tr. 4206–07.)

On July 29, 2021, Ms. Alger returned to the emergency department, complaining of fluctuating blood pressure. (Tr. 4137.) She denied abdominal pain, nausea, and vomiting. (*Id.*) An electrocardiogram, physical examinations, imaging, and lab work were normal, and she was discharged. (Tr. 4137–38.)

In March 2022, Ms. Alger went to the emergency room complaining of nausea, vomiting, and diarrhea. (Tr. 5097.) On examination, she had mild diffuse abdominal tenderness on palpation. (Tr. 5099.) She was treated with vancomycin. (Tr. 5105.)

Ms. Alger returned in August 2022, again complaining of diarrhea and abdominal pain for the last several days, as well as dizziness. (Tr. 5227.)

25

In April 2023, Ms. Alger presented to the emergency room for dental pain. (Tr. 5756.) She reported that most of her lower teeth had been surgically removed and that she was scheduled to receive dentures. (*Id.*) She denied gastrointestinal symptoms and joint pain. (*Id.*) She was prescribed Vicodin and instructed to follow up with her primary care doctor and dentist. (Tr. 5757.)

Ms. Alger returned to the emergency department in July 2023, complaining of dizziness and nausea for four days. (Tr. 5973.) Her examination was normal. (Tr. 5975–76.) Her nausea improved during her visit, and she was given intravenous fluids. (Tr. 5978.)

### 4.      Mental Health Impairments

Ms. Alger consulted with Desiree Paschal, a licensed professional clinical counselor, for an initial mental health assessment on November 2, 2020. (Tr. 63.) Ms. Alger reported that she was living with her mother because her own physical health issues made her unable to drive or take care of a house. (*Id.*) She said that her ileostomy bag disrupted her sleep, because she had to awaken frequently in the night to empty it. (*Id.*) She was diagnosed with major depressive disorder and generalized anxiety disorder; she said she was amenable to medication management but did not want to undergo individual counseling. (Tr. 65.) On examination, Ms. Alger was friendly and cooperative but presented with a depressed mood. (Tr. 71.) She showed impaired short-term memory, poor judgment, and limited insight. (Tr. 72.)

She had a virtual appointment with John Trimbath, a physician assistant, for a reevaluation on November 10, 2020. (Tr. 74.) She said "everything [was] going well" with her mental health, on medication, until her colonoscopy complications. (Tr. 79.) Since then, she has not been eating or sleeping well and has low energy or motivation. (*Id.*) Her mood was very anxious and depressed, and her affect was very blunted. (*Id.*) Mr. Trimbath wrote that Ms. Alger "[definitely] needs counseling" and started her on fluoxetine. (Tr. 82.)

26

At a virtual follow-up appointment on January 6, 2021, Ms. Alger said that she had been "doing good until week." (Tr. 95.) She found herself doing well after the colostomy reversal, but she has recently been crying for no reason and getting upset when talking about her medical history. (*Id.*) Mr. Trimbath noted that she had made "fair to good" progress with treatment and increased the dosage of her fluoxetine. (Tr. 97.)

On April 11, 2023, Ms. Alger underwent a psychological consultative evaluation with Carolyn Arnold, Psy.D. (Tr. 5534.) Ms. Alger described low motivation and energy, trouble sleeping, and crying often, and she said she has difficulty leaving her home. (Tr. 5535.) But she reported that counseling and medication had been helpful. (*Id.*) On examination, she displayed a sad and tired affect. (Tr. 5536.) Dr. Arnold diagnosed depression. (Tr. 5537.) She opined that Ms. Alger can understand, remember and carry out instructions. (*Id.*) She can sustain concentration and show persistence with simple tasks for a shorter period of time and multistep tasks for a shorter period of time. (Tr. 5538.) But she was distractible and mentally fatigued on examination. (*Id.*) Dr. Arnold noted that Ms. Alger reported no difficulty with social interactions in the past and had a history of interacting well with co-workers and supervisors and responding adequately to workplace pressures by swimming and walking after work. (*Id.*)

## IV. THE ALJ'S DECISION

The ALJ found that Ms. Alger meets the insured status requirements of the Social Security Act through September 30, 2024. (Tr. 2013.) The ALJ further found that Ms. Alger had engaged in substantial gainful activity from July to September 2016. (*Id.*) He found that Ms. Alger had performed work for pay between 2014 and 2020, but the remaining quarters fell below SGA levels. (Tr. 2013–14.)

The ALJ next determined that Ms. Alger had the following severe impairments: (1) cervical spondylosis without myelopathy; (2) lumbar spondylosis; (3) lumbrosacral

spondylosis; (4) osteoarthritis of the knees, status-post total left knee replacement; (5) essential hypertension; (6) asthma; (7) degenerative joint disease; (8) obstructive sleep apnea; and (9) depressive disorder. (Tr. 2014.)

The ALJ concluded that none of Ms. Alger's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 2016.)

The ALJ determined that Ms. Alger had the residual functional capacity ("RFC") to perform work at the light exertional level with a number of additional limitations. (Tr. 2019.)

Specifically, she can only occasionally push or pull with the bilateral upper extremities. (*Id.*) she can occasionally climb ramps and stairs, but she must never climb ladders, ropes, or scaffolds. (*Id.*) She can frequently stoop and occasionally kneel, crouch, and crawl. (*Id.*) She can frequently handle, finger, and feel bilaterally. (*Id.*) She must avoid all exposure to hazards like unprotected heights, moving machinery, and commercial driving. (*Id.*) She can tolerate a routine work setting and can respond appropriately to supervisors, coworkers, and work situations if the tasks performed are goal-oriented, performed without a production rate pace, and can be performed with no more than superficial interaction with others. (*Id.*) The ALJ defined "superficial interaction" to mean that the work would not require negotiating with, instructing, persuading, or directing the work of others and would not require tandem work. (*Id.*) She cannot interact with the public. (*Id.*)

The ALJ found that Ms. Alger had no past relevant work. (Tr. 2030.)

The ALJ then determined that—considering Ms. Alger's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that she could perform, including work as an "cleaner/housekeeper" (DOT 323.687-014), "mail clerk"

(DOT 209.687-026), and "inspector/hand packager" (DOT 559.687-074). (Tr. 2031.) The ALJ therefore found that Ms. Alger was not disabled. (*Id.*)

## V.    LAW & ANALYSIS

### A.    <u>Standard of Review</u>

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

29

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B.    Standard for Disability

To establish entitlement to DIB, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

Consideration of disability claims for both DIB and SSI follows a five-step review process. 20 C.F.R. § 404.1520.[5] First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of

---

[5] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in some instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.* The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (e.g., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent him

from doing his past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 404.1520(g). *See Abbott*, 905 F.2d at 923.

### C. Analysis

#### 1. The RFC and Ms. Alger's Leg and Hand Impairments

In her first assignment of error, Ms. Alger contends that the RFC is inconsistent with the objective medical record, in that (1) her lower extremity impairments do not allow her to work at the light exertional level and (2) her hand impairments do not allow her to frequently handle, finger, and feel.

With respect to Ms. Alger's lower extremity impairments, Ms. Alger points to her left knee arthroplasty and manipulations under anesthesia and argues that even after surgery she continued to exhibit an antalgic gait and limited mobility, pointing to Dr. Mikhail's May 2022 and March and September 2023 examinations, which each noted a mildly antalgic gait. (Tr. 4496, 5573, 5959). She also points to several instances where she was found to have reduced range of motion, swelling, and pain, although those records are largely from 2019. (Tr. 1940, 1941, 1956, 1964). She also argues that her right ankle was unstable, causing many falls and ultimately requiring reconstruction. She points to records from 2023 to argue that she continued to demonstrate symptoms after surgery.

This is a straightforward cherry-picking argument, and review of the records she cites do not convince the Court that the ALJ's finding is not supported by substantial evidence or adequately explained. Ms. Alger reported that she was "doing great" after her ankle surgery, with "really no significant pain." (Tr. 5554.) She was ambulating in regular shoes and had returned to "all normal activity." (Tr. 5557.) She showed an excellent response to Lyrica and ablation, reporting that her pain was improved substantially. (Tr. 4491 (rated a 2, with frequency of flareups decreasing)). She had normal range of motion in both legs, with normal muscle strength and tone.

32

(*E.g.*, Tr. 5573.) And her range of motion in the knee was only mildly limited. (*Id.*) Indeed, she was counseled to increase her activity. (Tr. 5574.)

It is true that an ALJ may not cherry pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding. *See, e.g.*, *Gentry v. Comm'r*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where ALJ failed "to address certain portions of the record, including evidence of a continuing illness that was not resolved despite use of increasingly serious and dangerous medications"). But an ALJ "does not 'cherry pick' the evidence merely by resolving some inconsistencies unfavorably to a claimant's position." *Solembrino v. Astrue*, No. 1:10-cv-1017, 2011 WL 2115872, at *8 (N.D. Ohio May 27, 2011). The Sixth Circuit has explained that allegations of cherry-picking evidence by the ALJ are "seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. Apr. 3, 2014) (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009)).

Here, the ALJ expressly acknowledged that Ms. Alger at times used a walker or cane, cited the instances where Ms. Alger reported falls, and thoroughly reviewed the medical evidence related to Ms. Alger's knees and ankle—including the relevant imaging and her treatment history. (Tr. 2015, 2017, 2021–22.) The ALJ reviewed her reports of pain and functional limitations. (Tr. 2020.) But the ALJ also set forth that Dr. Walker's notes show that after surgery that Ms. Alger was fully weight bearing, that pain management records show that her knee pain was not accompanied by instability, and that in June 2023 she reported only one fall in the previous year and did not complain of difficulty with walking. (Tr. 2021–27.)

The ALJ thoroughly and accurately reviewed the medical records, and the Court finds no reversible error in his conclusion that "[r]ecords do not reflect a persistent gait deficit, lower

33

extremity weakness or instability, or use of a cane or walker outside of periods of recovery from surgery, and do not establish a medical need for an assistive device." (Tr. 2028.)

With respect to her upper-extremity impairments, Ms. Alger again simply points to evidence she says support greater limitations. She points out that she had bilateral carpal tunnel requiring surgical release and a right thumb arthroplasty and received ongoing injections. She directs the Court to MRI imaging showing moderate left neural foraminal stenosis and mild impingement. (Tr. 1546.)

Here again, the ALJ carefully reviewed the medical evidence and acknowledged these records and Ms. Alger's reports of her pain and functional limitations. But the ALJ concluded that the "[t]reatment notes do not reflect persistent complaints of hand or thumb pain during the period at issue, and do not indicate a persistent deficit in grip strength." (Tr. 2028.) The ALJ pointed to examinations conducted after the thumb arthroplasty that showed good range of motion of the fingers and intact neurovascular functioning. (*E.g.*, Tr. 1505.) The ALJ pointed out that Ms. Alger worked as a cashier and stocker after the procedure, and later as a lifeguard for 12 hours per week. (Tr. 2028.) He pointed out positive results from the release procedures and corticosteroid injections. (Tr. 2020.)

It is also important to note that review of an ALJ's decision is not done in isolation. Instead, the Court looks at "the record as a whole to determine whether there is substantial evidence to support the ALJ's finding." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 532 (6th Cir. 1997); *see also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("In order to affirm the Commissioner's determination, the decision must be supported by substantial evidence in the record as a whole.").

34

Here, the ALJ further supported his conclusions by reference to Ms. Alger's activities of daily living. The ALJ pointed out that Ms. Alger reported in April and May 2023 that she was able to complete some household chores and her activities of daily living without an assistive device, albeit slowly, and worked for several years as a lifeguard. (Tr. 2027.)

And finally, the ALJ supported the RFC with the opinions of the state agency medical consultants, who opined that Ms. Alger remained capable of light work and frequent bilateral handling and fingering, with the additional postural and other limitations included. (Tr. 2029.) The ALJ explained that those opinions were persuasive in part because "[e]xaminations at the hearing level continued to indicate the claimant was alert and in no distress, with intermittent knee, lumbar, knee, and ankle tenderness, or restrictions in range of motion, 5/5 strength, intact sensation and reflexes, intact coordination, no persistent edema or swelling, no persistent gait deficit, and no persistent use of an assistive device, consistent with light work with postural limitations." (*Id.*) Ms. Alger directs the Court to no medical opinion providing for more restrictive limitations.

"It is the ALJ's place, and not the reviewing court's, to resolve conflicts in evidence." *Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 670 (6th Cir. 2009) (quotation marks and citation omitted). The Court is convinced that the ALJ reasonably did so here, and that the ALJ's decisions are supported by substantial evidence.

Therefore, Ms. Alger's first assignment of error is overruled.

### 2. Ms. Alger's Sleep Disorders

In her second assignment of error, Ms. Alger contends that the ALJ failed to address certain evidence of sleep related disorders and find restless leg syndrome and sleepwalking to be severe medically determinable impairments. She contends that the ALJ failed to incorporate appropriate functional limitations in the RFC related to these remaining sleep disorders.

35

Ms. Alger points to records from 2017, 2018, and 2019 where she sought treatment from reported falls from sleepwalking. (*E.g.*, Tr. 1509, 1593, 1771 1757, 2023.) She argues that this "extensive evidence" should have led the ALJ to incorporate limitations based on a lack of concentration and focus due sleep deprivation and obstructive sleep apnea.

To the extent Ms. Alger is arguing that the ALJ erred at Step Two, any error there would be harmless. When an ALJ finds severe and non-severe impairments at Step Two and continues with the subsequent steps in the sequential evaluation process, any error at Step Two is harmless. *E.g.*, *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). Moreover, here the ALJ explicitly stated that he was considering "[r]eported difficulties with sleep or fatigue . . . as symptoms of obstructive sleep apnea." (Tr. 2015.)

Turning to the thrust of Ms. Alger's assignment of error—that the ALJ should have included functional limitations based on a lack of concentration and focus based on sleep-related impairments—the Court is not convinced that there is reversible error in the ALJ's conclusions or reasoning.

First, as the Commissioner points out, the ALJ *did* address relevant records regarding sleep disorders.

At Step Two, the ALJ acknowledged that Ms. Alger was "diagnosed with restless leg syndrome and prescribed ropinirole" but summarized that "[t]reatment notes do not reflect regular associated complaints, or functional limitations" from that condition. (Tr. 2015.) The ALJ then noted at Step Three that Ms. Alger's obstructive sleep apnea had not led to "three overnight hospitalizations for respiratory symptoms, complications, or exacerbations." (Tr. 2017.)

The ALJ later in the decision acknowledged Ms. Alger's hearing testimony. Tr. 2020 ("She alleged she would need three to four extra breaks during the day. . . . She reported use of a CPAP

36

machine for her sleep problem. . . . She [later] stated she was unable to use her CPAP until she had

healed from the bowel problems. . . . She [later] reported . . . 100 falls over the prior three years .

. . . She reported difficulty learning new tasks, problems following instructions, word loss, and

working better alone . . . . She reported drowsiness as a side effect of medications . . . .")

The ALJ then specifically discussed the evidence of Ms. Alger's sleepwalking as follows:

On October 31, 2017, the claimant sought emergency treatment at Lake Hospital System for an injury to the right upper extremity after a fall. The fall presumably occurred while the claimant was sleepwalking at night, as she woke in the basement with an injury to the right arm. The claimant reported she sleepwalks four times a week. . . . CTs of the brain and cervical spine were normal.

. . .

On November 15, 2017, the claimant complained to Dr. Nahra of continued right thumb and wrist pain, in addition to injuries caused by falls while sleepwalking.

. . .

On August 21, 2018, the claimant had a follow-up with John Baron, M.D., of University Hospitals Madison Physicians. Dr. Baron noted a history of severe obstructive sleep apnea, restless leg syndrome, and sleepwalking, and the claimant reported sleepwalking at least twice a week. Dr. Baron noted recently increased CPAP pressure due to persistently elevated obstructive apneas. The claimant complained of excessive daytime sleepiness, but reported feeling rested with sleep when she is able to keep the CPAP on. An examination was normal. Dr. Baron instructed the claimant to continue nightly use of the CPAP at an increased pressure. He prescribed ropinirole and recommended weight loss. Dr. Baron noted the claimant was training a dog to detect when she is sleep walking to lead her back to her bedroom in an attempt to keep her safe.

During October and November of 2018, the claimant underwent treatment with neurologist Kristen A. Smith, complaining of memory loss, sleepwalking, difficulty with word finding, and feeling like she is in a fog. She indicated her neighbors are worried because they have caught her outside while asleep, and she said her son found her eating dog food one night. The claimant reported a history of obstructive sleep apnea, but reportedly pulls the CPAP off during the night while asleep. She reported use of ropinirole for restless leg syndrome and lorazepam for anxiety. Examinations were normal, and indicated the claimant was alert, oriented, and in no acute distress, with normal heart, lungs, and extremities, no tremors, normal motor and strength in all extremities, no drift, normal sensation and reflexes, intact coordination, and normal gait, with no ataxia and negative Romberg testing. Dr.

37

> Smith increased the ropinirole dosage and added clonazepam. Although the claimant has experienced multiple musculoskeletal injuries from sleepwalking accidents over the course of the current adjudicating period, the claimant's sleep disturbances improved after she began taking clonazepam in November of 2018, under Dr. Smith's care.

(Tr. 2023–24) (internal record citations omitted).

The ALJ also identified those treatment records from after 2018 where Ms. Alger was found to be alert or very pleasant. (*E.g.*, Tr. 2026) (citing examinations from April and May 2023). The ALJ noted in particular that mental health examinations from therapy records "generally found she was cooperative, friendly, and alert, with intact attention and concentration, normal speech, normal mood, logical thought process, and good insight and judgment." (*Id.*) And the ALJ noted that the consultative examiner found her to be cooperative with good judgment and noted that she could recall two of three words after a delay, repeat six digits forward and two backward, perform serial sevens to 72, spell 'world' backward, follow a three-step command, and did not have difficulty following the conversation. (Tr. 2027.)

After reviewing this evidence in detail, the ALJ found that Ms. Alger has a moderate limitation when it comes to concentrating, persisting, and maintaining pace. (Tr. 2018.) But the ALJ also accurately noted that:

> She did not report associated problems with driving, going shopping, doing household tasks, or managing her finances . . . . Treatment notes do not reflect persistent observed deficits in concentration or attention. The consultative examiner found the claimant could repeat six digits forward and two backward, perform serial sevens to 72, spell 'world' backward, and did not have difficulty following the conversation . . . .

(Tr. 2018.)

The ALJ later discussed his reasoning as follows:

> Treatment notes do not support the frequency and severity of falls alleged, or reported balance and gait deficits. For example, in June of 2023, she reported only one fall with an injury in the prior year, no difficulty with

38

> walking or imbalance, and no difficulty performing activities of daily living, inconsistent with the frequency and severity of reported balance issues, falls, and difficulty walking. . . .
>
> Treatment notes also did not indicate regular complaints of fatigue from unrestful sleep, or observed tiredness. Examinations outside of periods of recovery regularly indicated she was alert and in no distress . . . .

(Tr. 2027–28.)

After weighing this evidence, the ALJ noted his conclusion, that to account for any deficits in concentration, Ms. Alger would be limited to a routine work setting, where tasks performed are goal-oriented, but not at a production rate pace, and where she would not be instructing, persuading, or directing the work of others, or working in tandem, or interacting with the public. (Tr. 2028.) The ALJ pointed out that this RFC was also supported by an opinion from state agency medical and psychological consultants. (Tr. 2029.)

The Court sets forth this detailed discussion because it is simply not true that the ALJ "largely failed to address the extensive sleep-related evidence" here. (ECF No. 9-1, PageID# 6034.) The ALJ addressed each of the medical appointments that she identifies in her brief. (*See id.* at PageID# 6035.)

Ms. Alger's argument largely points to one sentence from the ALJ's detailed decision—his note that her "sleep disturbances improved after she began taking clonazepam in November of 2018." Ms. Alger is correct that the ALJ did not specifically identify that Ms. Alger told her doctor in June 2019 that she had been sleepwalking more, such that she was prescribed a boot to protect her ankle during sleepwalking events. (*See* Tr. 1946.) But "[a]n ALJ need not discuss every piece of evidence in the record for [the ALJ's] decision to stand." *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004); *see also Loral Def. Sys.-Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999) ("An ALJ can consider all the evidence without directly addressing in his written

39

decision every piece of evidence submitted by a party. Nor must an ALJ make 'explicit credibility findings' as to each bit of conflicting testimony, so long as his factual findings as a whole show that he 'implicitly resolve[d]' such conflicts.") (citation omitted).

Here, the ALJ's analysis demonstrates that he carefully reviewed the record, including the medical evidence related to Ms. Alger's sleepwalking and restless legs. While the ALJ ultimately declined to find restless legs or sleepwalking as severe conditions, the mere existence of an impairment does not establish that Ms. Alger was significantly limited from performing basic work activities for a continuous period of time. *See, e.g.*, *Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007).

The ALJ's detailed analysis sets forth how he considered the resulting functional limitations of Ms. Alger's sleep conditions. He found that she frequently presented as alert, pleasant, and cooperative throughout the alleged disability period, saw treatment improvement with medication and other solutions, and maintained adequate concentration during the consulting examination, among other things as set forth in detail above.

The Court cannot find error where the ALJ thoroughly and accurately discussed the medical records and reasonably explained why further concentration or focus limitations would be unsupported, especially where the ALJ's conclusions are consistent with or more restrictive than the state agency consultants' opinions and where Ms. Alger has not cited any medical opinion evidence demonstrating that there are additional specific functional limitations that the ALJ did not address.

The ALJ's RFC determination is supported by substantial evidence and comports with the applicable law. The Court therefore overrules Ms. Alger's second assignment of error.

### 3. Ms. Alger's Ability to Work on a Continuing Basis

In her final assignment of error, Ms. Alger contends that the ALJ failed to consider whether she could sustain competitive employment on a regular and continuing basis. She argues that the combination of her impairments severely limit "workday sustainability," pointing to her gastrointestinal issues (which, she says, would necessitate further bathroom breaks), vertigo, migraines, nausea, vomiting, and fatigue. (ECF No. 9-1, PageID# 6037.) She claims that the ALJ considered her impairments only in isolation, pointing to the ALJ's "chronological summary of evidence," which she says "minimizes the impact of the multiple, co-existing and severely debilitating impairments . . . ." (*Id.*, PageID# 6038.) She says the ALJ's analysis therefore fails to comply with SSR 96-8p.

The Commissioner defends the ALJ's decision, noting that the ALJ adequately explained why he found no further functional limitations than those in the RFC. The Commissioner points out that the ALJ considered every one of Ms. Alger's impairments, including those found not severe, and explained how he took them into account. The Commissioner argues that the ALJ's conclusions in this regard are supported by substantial evidence.

The Court agrees with the Commissioner.

Social Security Ruling 96-8p recognizes that, "[w]hile a 'not severe' impairment[] standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim." SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996). This standard recognizes that " 'the definition [of a non-severe impairment] contemplates that non-severe impairments may very well impose *some* type of limitation on basic work activities.'" *Patterson v. Colvin*, No. 5:14-cv-1470,

2015 WL 5560121, at *4 (N.D. Ohio Sept. 21, 2015) (quoting *Katona v. Comm'r of Soc. Sec.*, No. 14-cv-10417, 2015 WL 871617, at *6 (E.D. Mich. Feb. 27, 2015) (emphasis in original)).

In *Emard v. Commissioner of Social Security*, 953 F.3d 844 (6th Cir. 2020), the Sixth Circuit clarified an ALJ's obligations under SSR 96-8p with respect to non-severe impairments. The court noted that "[d]istrict courts in this circuit have held that an ALJ need not specifically discuss all nonsevere impairments in the residual-functional-capacity assessment when the ALJ makes clear that her decision is controlled by SSR 96-8p." *Id.* at 851–52. The court agreed with those cases, holding that the ALJ's "express reference to SSR 96-8p, along with her discussion of the functional limitations imposed by [the claimant's] nonsevere impairments at step two of the analysis" meant that the ALJ complied with SSR 96-8p, even where the ALJ failed to specifically discuss the claimant's non-severe impairments when formulating the RFC. *Id.* at 852.

Here, the ALJ specifically acknowledged—citing SSR 96-8p—that in making the RFC finding, he must determine "her ability to do physical and mental work activities on a sustained basis" after "consider[ing] all of the claimant's impairments, including impairments that are not severe." (Tr. 2012.)

The ALJ then discussed, in remarkable detail considering the size of this record, how he considered Ms. Alger's impairments and weighed the evidence. For instance, at Step Two, the ALJ acknowledged Ms. Alger's hyperlipidemia but cited records showing that it was controlled without significant symptoms on medication. (Tr. 2014.) The ALJ discussed Ms. Alger's complicated gastrointestinal history but noted that after the ileostomy closure, records do not reflect regular complaints of abdominal pain or other gastrointestinal symptoms. (*Id.*) The ALJ discussed Ms. Alger's vertigo and dizziness starting in 2022, but he accurately noted that it had been largely

42

improved through medication and therapy, such that by June 2023 she reported no difficulty with walking or balance and no difficulty performing her activities of daily living. (Tr. 2014–15.)

In crafting the RFC, the ALJ specifically wrote that he had "considered all symptoms." (Tr. 2019.) And his discussion throughout the decision makes clear that he did, in fact, consider her impairments in combination. He referred to a "combination of impairments" at Step Two. (Tr. 2016.) He repeatedly referred to "her impairments" or "worsening impairments." (*E.g.*, Tr. 2020); *see also Loy v. Sec'y of Health and Human Srvs.*, 901 F.2d 1306, 1310 (noting the ALJ's reference to "impairments (plural)" and a "combination of impairments" in finding that the ALJ had considered the combined effect of impairments). He compared findings from within and outside of "periods of recovery." (Tr. 2027–28.) And his reasoning otherwise clearly indicates that he considered the combined effect of Ms. Alger's impairments on her ability to sustain employment.

While Ms. Alger characterizes his decision as a "chronological summary of evidence," there is no reason to assume or conclude here that the ALJ—despite saying otherwise—failed to consider the combined effects of her impairments as required, or failed to consider whether she could sustain employment despite that combination of impairments. "An ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination." *Loy*, 901 F.3d at 1310.

Post-*Emard* decisions from this district have routinely affirmed the Commissioner in similar circumstances. *See, e.g.*, *Holt v. Comm'r of Soc. Sec.*, No. 1:23-CV-00209-BMB, 2023 WL 8770503, at *8 (N.D. Ohio Nov. 1, 2023) (affirming ALJ's decision despite failure to discuss non-severe impairments when formulating RFC where ALJ cited to SSR 96-8p, discussed the functional limitations stemming from the claimant's non-severe impairments imposed at Step Two,

43

and stated that ALJ considered non-severe impairments when formulating RFC), *report and recommendation adopted*, 2024 WL 83029 (N.D. Ohio Jan. 8, 2024); *Yost v. Comm'r of Soc. Sec.*, No. 1:23-CV-00699-JRA, 2024 WL 1054234, at *7–9 (N.D. Ohio Jan. 26, 2024) (same), *report and recommendation adopted*, 2024 WL 1051654 (N.D. Ohio Mar. 11, 2024); *Nelson v. Comm'r of Soc. Sec.*, No. 1:21-CV-01784-JG, 2023 WL 2435322, at *15–16 (N.D. Ohio Jan. 31, 2023), *report and recommendation adopted*, 2023 WL 2431989 (N.D. Ohio Mar. 9, 2023).

The Court is similarly convinced that the ALJ's conclusions are supported by substantial evidence. It is patently true that Ms. Alger has had a long and painful treatment history for a number of different conditions. But she does not direct the Court to medical records or opinion evidence establishing a functional limitation stemming from her gastrointestinal history (after the ileostomy closure), or her vertigo, migraines, nausea, vomiting, and fatigue that the ALJ failed to consider. The ALJ's RFC is supported by the opinions of the state agency medical consultants, and it was crafted after a thorough and accurate review of the record evidence. The Court finds no reversible error here.

Because the ALJ complied with SSR 96-8p and because the resulting RFC determination was supported by substantial evidence, the Court overrules Ms. Alger's third assignment of error.

## VI.    CONCLUSION

Having overruled Ms. Alger's assignments of error for the reasons set forth above, the Court AFFIRMS the Commissioner's final decision.

Dated: <u>July 31, 2026</u>                    /s/ *Jennifer Dowdell Armstrong*
                                             Jennifer Dowdell Armstrong
                                             U.S. Magistrate Judge

44